# MERCHANTS' INSURANCE COMPANY *v.* ALLEN.
# MERCHANTS' INSURANCE COMPANY *v.* WEEKS.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF LOUISIANA.

Argued March 17, 18, 1887. — Decided March 28, 1887.

While a vessel was in transit on a voyage from Liverpool to New Orleans,
its home port, a policy was taken out, " to navigate the Atlantic Ocean
between Europe and America, and to be covered in port and at sea,"
these words being written in the printed blank; and the insurers know-
ing the home port of the vessel. The policy also contained in print the
words — " Warranted by the assured not to use port or ports in Eastern
Mexico, Texas, nor Yucatan, nor anchorage thereof during the continu-
ance of this insurance." The vessel completed the voyage to New Or-
leans, went thence to Ship Island for a return cargo to Liverpool, and
was lost from peril of the sea in the Gulf of Mexico, on the way from
Ship Island to Liverpool. *Held*, that there was no conflict between the
written and the printed parts of the policy; that the insurers' contem-
plated that the vessel would navigate the Gulf of Mexico, except the
designated ports, and that the policy covered the vessel at the time of
the loss.

The ultimate disputed fact to be established in a suit in admiralty upon a
marine policy of insurance being the seaworthiness or unseaworthiness
of the vessel, it was no error in the Circuit Court at the trial to refuse to
find the evidence from which this ultimate fact was deduced.

The court discountenances attempts by counsel in preparing bills of excep-
tion in admiralty causes to have the cause retried here on the evidence.

An over-insurance of cargo is not a breach of warranty by the owner of
the vessel not to insure his interest in the vessel beyond a stipulated
amount: and the over-insurance in this case, if any, does not tend to
establish fraud in the loss of the vessel.

Whether, since the act of February 16, 1875, new testimony can be taken
after an appeal in admiralty to this court, or amendments to the plead-
ings allowed, is not decided.

THESE were appeals from decrees in admiralty. The case is
stated in the opinion of the court.

*Mr. Joseph P. Hornor* for appellant. *Mr. Charles W.
Hornor* was with him on the brief.

*Mr. J. R. Beckwith* for appellee Allen.

*Mr. Richard H. Browne* for appellee Weeks.   *Mr. Charles B. Singleton* was with him on the brief.

Mr. Chief Justice WAITE delivered the opinion of the Court.

These appeals present the same questions, and may be considered together.   The suits were brought on two policies of insurance, one insuring the interest of George D. Allen and the other that of Silas Weeks, in the ship Orient, from April 15, 1882, to April 15, 1883, " to navigate the Atlantic Ocean between Europe and America, and to be covered in port and at sea."   At the time the policy was issued the ship was on the Atlantic Ocean, bound on a voyage from Liverpool, England, to New Orleans, Louisiana, laden with a general cargo.   The company knew of this when it executed and delivered the policy, and insured the vessel lost or not lost.   New Orleans was the home port of the ship, and there the home office of the company was situated.   All parties knew that the ship was sailing to and from that port.   The policy also contained this clause :

" Warranted by the assured not to use port or ports in Eastern Mexico, Texas, nor Yucatan, nor anchorage thereof, during the continuance of this insurance, nor ports in West India Islands between July 15th and October 15th ; nor ports on the northeast coast of Great Britain beyond the Thames, nor ports on the continent of Europe, north of Antwerp, between November 1st and March 1st."

This warranty is part of the printed portion of the policy, but the portion describing what the insurance covered is in writing.

The ship arrived safely in New Orleans on her voyage from Liverpool, and, after unloading, proceeded to Ship Island, where she took on a cargo of timber for Liverpool, and while on her voyage to that port she was struck by a cyclone about one hundred miles out in the Gulf of Mexico and wrecked.

The first question presented by the appellants is whether the insurance covered the ship while in the Gulf of Mexico. This depends on the meaning of the language of the policy.

construed in the light of the circumstances which surrounded the parties at the time of its execution. The evident purpose was to insure a New Orleans ship engaged in the Atlantic trade between Europe and America for a year, both at sea and in port. At the time the insurance was effected she was on a voyage between Liverpool and New Orleans, and all parties knew that the business in which she was engaged took her in and out of the last named port. That was her home port, and that was where the insurance company had its own office. That the navigation of the Gulf was contemplated during the life of the policy is shown by the fact that certain of its ports were excluded from the risks the company assumed. This fairly implies that all others might be used, and as the ship was to be insured all the time during the year if she was employed in navigating the Atlantic between Europe and America, whether at sea or in port, it is evident the parties intended to cover her by the policy while sailing from port to port in that general trade. New Orleans is a leading American port in that trade. To get to and from it ships must navigate the Gulf of Mexico.

No one can doubt that the policy would cover at all times during the year a voyage to all the ports of Great Britain except those northeast of the Thames, and to all ports on the continent of Europe north of the Mediterranean as far as Antwerp, and elsewhere on the northern coast between March and November. Yet in doing so the ship would have to sail in waters other than those of the Atlantic Ocean. Taking the whole policy together, we cannot doubt it was the intention of the company to cover the ship while engaged in the Atlantic trade between ports in Europe and America other than those specially warranted against. Whether this would include ports east of Gibraltar it is unnecessary now to decide.

It is true that, if there is a conflict between the written words of a policy and those that are printed, the writing will prevail, but, if possible, the writing and the print are to be construed so that both can stand. Here we think it clear that the written clauses, when construed in connection with those

that are in print, have the effect of describing the trade in which the vessel was to be employed rather than confining her navigation exclusively to the waters of the Atlantic Ocean. If it were otherwise, while the ship would be insured in port and on the ocean, she would be uninsured while performing that part of her voyage from the ocean to the port and from the port to the ocean. Such a condition of things will never be presumed in the absence of the most convincing proof to the contrary.

We have no hesitation in deciding that the insurance covered the ship at the time of her loss.

This disposes of all the questions which arise on the finding of facts.

The principal controversy in the case was as to the seaworthiness of the vessel. The court has found as a fact that she was seaworthy when she left Liverpool on the voyage during which the policies were issued, and also when she sailed from Ship Island on the voyage in which she was lost. To these questions the testimony was largely directed, and it was to some extent conflicting. At the trial the court was asked to find as follows:

"The ship Orient, prior to her departure on her last voyage, on 1st August, 1882, was run aground on Ship Island bar, where she remained for three days and two nights in bad and squally weather, 'rolling and pounding heavily,' and while on the bar, and after coming off, drew and continued to draw four inches of water per hour until the final wreck, and that when she was thrown upon her beam ends by the force of the storm she was prevented from righting herself by the large amount of water which had leaked into her hold, and hence the cutting away of her masts was of no avail, and the said leak was the direct cause of her loss, and she was unseaworthy when she started on her last voyage;" and "that when the ship Orient was hauled off the bar at Ship Island where she had been aground as aforesaid, she leaked four inches of water per hour, and said leak did not diminish from said time, 3d August, 1882, until 5th September, 1882, when she went to sea on her last voyage, nor until she was finally

wrecked, and said leak could have been discovered only by unloading said vessel and taking her to New Orleans and putting her in the dry-dock, which was not done, and no other precaution was taken to ascertain whether said vessel was injured by having been aground, or to ascertain the leak or leaks, save by a cursory examination of her bottom by a diver, without taking her out of the water;" and "that the ship Orient was knowingly sent to sea by the assured in an unseaworthy state and in an unfit condition, which necessarily increased the danger which led to her loss."

This was refused, and an exception taken. To present the question of the propriety of that refusal to this court, a bill of exceptions was prepared, containing the entire evidence in the cause, which was signed by the circuit judge with the remark that "this bill is claimed by the respondent under the authority of *The Francis Wright*, 105 U. S. 381, considering which case the court does not feel at liberty to deny the bill."

In the case of *The Francis Wright* it was ruled, p. 387, and, as we are satisfied, correctly, "that if the Circuit Court neglects or refuses, on request, to make a finding one way or the other, on a question of fact material to the determination of the cause, when evidence has been adduced on the subject, an exception to such refusal, taken in time and properly presented by a bill of exceptions, may be considered here on appeal. So, too, if the court, against remonstrance, finds a material fact which is not supported by any evidence whatever, and an exception is taken, a bill of exceptions may be used to bring up for review the ruling in that particular. In the one case, a refusal to find would be equivalent to a ruling that the fact was immaterial; and, in the other, that there was some evidence to prove what is found, when in truth there was none." "But," it was added, "this rule does not apply to mere incidental facts which only amount to evidence bearing on the ultimate facts of the case. Questions depending on the weight of evidence are, under the law as it now stands, to be conclusively settled below; and the fact in respect to which such an exception may be taken must be one of the material and ultimate facts on which the correct determination of the cause depends."

In the present case, the ultimate fact to be proved was the seaworthiness of the vessel. That ultimate fact has been found. What the company wanted to have incorporated in the findings were the "mere incidental facts" which only amounted to evidence from which the material fact of seaworthiness or unseaworthiness was to be ascertained. This was properly refused.

Another bill of exceptions was taken, because the court made the following findings, when there was no evidence whatever to support them:

"Fourth. That when said risk was taken by the said defendant and said policy executed and delivered the said ship Orient was on the Atlantic Ocean, bound on a voyage from the port of Liverpool to the port of New Orleans, in the United States, laden with a general cargo; that the defendant at the time of the execution and delivery of the policy of insurance was well aware of that fact, and had notice and knowledge that the said vessel was prosecuting said voyage, bound to the port of New Orleans, and insured the vessel, lost or not lost.

"Fifth. That the port of New Orleans was the home port of the said Orient and was the domicil of the underwriting company, and that all parties knew that the ship was sailing to and from that port, and when the policy sued on was issued it was the intention of the assured and the underwriters that the said policy was to cover risks while said ship was navigating the Gulf of Mexico, except excluded ports."

"Twenty-first. That at the time said ship Orient was wrecked and destroyed she was under the protection of said policy of insurance, and was lost and wrecked by a peril of the sea insured against."

So far from there being no evidence to support these findings, the record is full of facts from which the conclusions reached by the court might be drawn. The apparent purpose of counsel in preparing the bills of exceptions was to have the whole case retried here on all the evidence. That this cannot be done, since the act of 1875, has long been settled. *The Abbotsford,* 98 U. S. 440; *The Benefactor,* 102 U. S. 214; *The Adriatic,* 103 U. S. 730; *The Annie Lindsley,* 104 U. S. 187.

The case as tried below is reported as *Baker* v. *Merchants' Mut. Ins. Co.*, 16 Fed. Rep. 916, where the discussion upon the effect of the evidence will be found.

It only remains to consider an application which has been made in this court for leave to amend the pleadings and introduce new testimony. At an early day in the present term leave was granted the appellants on their motion to take additional testimony. Under this leave depositions have been taken which are now on file. Their purpose is to show an over-insurance by the owners of the vessel on the cargo, which was also owned by them in whole or in part. The pleadings, as they stood in the court below, present no issue to which such testimony is applicable, and the appellants now ask leave to amend their answers so as to let it in.

Without determining whether, since the act of February 16, 1875, "to facilitate the disposition of cases in the Supreme Court, and for other purposes," (c. 77, 18 Stat. 315,) new testimony can, under any circumstances, be taken after an appeal in admiralty to this court, or amendments to the pleadings allowed, and, if so, what would be the proper practice to give effect to an application for that purpose, we deny this motion. An over-insurance of the cargo is not a breach of a warranty by the owner of the vessel not to insure his interest in the vessel beyond a certain amount, and the new testimony, standing by itself, fails to make out such a case of over-insurance on the cargo as would tend to establish a fraudulent loss of the vessel. The over-insurance of the cargo, if any there was, grew out of an insurance by Baring Brothers & Co., in London, for their protection as acceptors of drafts drawn by the captain on them to meet disbursements in the purchase of the timber which composed the cargo; at least that is the fair inference from the testimony.

*The decree in each of the cases is affirmed.*